IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KELLY STEWART MUNN,                    §
                                       §
                Petitioner,            §
                                       §
v.                                     §          Civil Action No. 4:16-CV-882-O
                                       §
LORIE DAVIS, Director,                 §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,    §
                                       §
                Respondent.            §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Kelly Stewart Munn, a state prisoner confined in the Correctional Institutions Division

of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, Director of TDCJ,

Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded

that the petition should be denied.

## I. BACKGROUND

Petitioner was charged in Tarrant County, Texas, Case No. 1169559R, with murdering Scott

Sartain (Count One) on or about September 6, 2007, and engaging in organized criminal activity –

murder (Count Two). Clerk's R. 2, ECF No. 24-17. On September 25, 2009, in the 396th District

Court, a jury found him guilty on both counts and assessed his punishment at 99 years' confinement

for each offense. *Id.* at 276-77, 295-96. Petitioner appealed his convictions, but the Second District

Court of Appeals of Texas affirmed the trial court's judgments, the Texas Court of Criminal Appeals

refused his petition for discretionary review, and the United States Supreme Court denied his petition

for writ of certiorari. Docket Sheet 1-2, ECF No. 24-2. Petitioner also filed two state habeas-corpus

applications challenging his convictions, which were denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. SHR01 2 & Action Taken, ECF Nos. 24-27 & 24-29; SHR02 2 & Action Taken, ECF Nos. 24-31 & 24-32.[1] This federal habeas-corpus petition followed.

## II. ISSUES

Petitioner raises five grounds for habeas relief: actual innocence (ground one); insufficient evidence (ground two); ineffective assistance of trial counsel (grounds three and four); and void convictions (ground five). Am. Pet. 6-9, ECF No. 19.

## III. RULE 5 STATEMENT

Respondent believes that, except for his fifth ground, Petitioner has exhausted his state court remedies as to the claims raised and that his petition is timely filed. Resp't's Ans. 9, ECF No. 27.

## IV. PROCEDURAL DEFAULT

Under his fifth ground, Petitioner claims that the trial court lacked jurisdiction over his criminal case, thereby rendering his convictions void. Am. Pet. 9, ECF No. 19. Specifically, Petitioner contends that the trial court lacked jurisdiction over the parties and subject matter because the indictment was presented to the 371st Judicial District Court and "[t]here was never an 'Order of Transfer' executed or entered into the record transferring the case from the 371st to the 396th" or "consent of the 396th to receiving the case." *Id.* Respondent asserts that the claim, raised for the first time in this federal petition, is unexhausted and procedurally barred from federal habeas review. *Id.* at 22-25.

---

[1]"SHR01" and "SHR02" refer to the record of Petitioner's state habeas proceedings in WR-85,426-01 and WR-85,246-02, respectively.

Petitioners seeking habeas-corpus relief under § 2254 are required to exhaust all claims in state court before requesting federal collateral relief. 28 U.S.C. § 2254(b)(1); *Fisher v. Texas,* 169 F.3d 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842-48 (1999); *Fisher,* 169 F.3d at 302; *Carter v. Estelle,* 677 F.2d 427, 443 (5th Cir. 1982). In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals. *Richardson v. Procunier,* 762 F.2d 429, 431-32 (5th Cir. 1985). Therefore, a Texas prisoner may satisfy the exhaustion requirement by presenting both the factual and legal substance of a claim to the Texas Court of Criminal Appeals in either a petition for discretionary review or a state habeas-corpus proceeding pursuant to article 11.07 of the Texas Code of Criminal Procedure in a procedurally proper manner. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 (West 2015); *Depuy v. Butler,* 837 F.2d 699, 702 (5th Cir. 1988).

Petitioner concedes that he raises his fifth ground for the first time in the instant petition. Am. Pet. 8, ECF No. 19. Under the Texas abuse-of-the-writ doctrine, however, Petitioner cannot now return to state court for purposes of exhausting the claim. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4(a)-(c). The abuse-of-the-writ doctrine represents an adequate state procedural bar to federal habeas review. *See Smith v. Johnson*, 216 F.3d 521, 523-24 (5th Cir. 2000); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). To overcome the procedural bar, Petitioner must demonstrate either cause and actual prejudice for the default or a showing that he is actually innocent of the crimes for which he stands convicted. *See Sawyer v. Whitley,* 505 U.S. 333, 338 (1992)*; Ylst v. Nunnemaker,* 501 U.S. 797, 801-07 (1991); *Smith v. Johnson,* 216 F.3d 521, 523-24 (5th Cir. 2000). "Cause" can be established by showing that "some objective factor external" to Petitioner,

something that cannot fairly be attributed to him, prevented him from properly raising the claim in state court. *McClesky v. Zant,* 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1980)). On the other hand, claims of actual innocence must be based on new evidence, and Petitioner must show that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins,* 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo,* 513 U.S. 298, 329 (1995)).

Petitioner makes no effort to explain his failure to exhaust the claim and merely asserts that the claim was recently discovered and that a void conviction may be attacked at any time. Pet'r's Reply 9, ECF No. 28. However, the alleged defect in the indictment was discoverable before trial with any diligence. And, the concept of attacking void judgments at any time is a state-law matter and does not excuse Petitioner's failure to exhaust the claim as required by § 2254(b)(1)(A). Petitioner also asserts under his first ground that he is actually innocent of the offenses based on the fact that the victim's body was never found and the 2013 discovery of four witnesses claiming to have seen the victim alive in Abilene, Texas, after his alleged disappearance. Pet'r's Am. Br. 8-9, ECF No. 20; Pet'r's Am. Exs. A-D, ECF No. 21. However, the state habeas court, who also presided at Petitioner's trial, found that the new witnesses were not credible and that their affidavits were questionable in light of the credible evidence presented at trial, the bias of the investigator who obtained the affidavits on Petitioner's behalf,[2] and the fact that each witness recalled a single interaction with the victim in 2008 or 2009 and made their identification of the victim after being shown a single photograph and that none of the witnesses could give a specific date for their alleged

---

[2]Apparently, there was animus on the part of the investigator toward Petitioner's trial attorneys because of unpaid investigation fees. *Id.* at 270.

interaction with the victim or expressed that they had a prior acquaintance with the victim. SHR02 269-70, ECF No. 24-33. Such credibility determinations are entitled to deference, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Galvam v. Cockrell,* 293 F.3d 760, 764 (5th Cir.2002); *Carter v. Collins,* 918 F.2d 1198, 1202 (5th Cir.1990). Deferring to the state court's credibility determination, Petitioner's "new evidence" is unreliable. Thus, he fails to make a colorable showing that he is actually innocent of the offenses for which he was convicted. *See House v. Bell,* 547 U.S. 518, 537 (2006). Absent a showing of cause and prejudice or a miscarriage of justice, such showing not having been demonstrated, Petitioner's fifth ground is procedurally barred from the Court's review.

## V. DISCUSSION

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28

U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals, the state's highest criminal court, refuses discretionary review or denies state habeas-corpus relief without written order, opinion, or explanation, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter*, 562 U.S. at 100; *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1191-92 (2018).

## A. Actual Innocence

As noted above, under his first ground, Petitioner claims that he is actually innocent of the offenses for which he was convicted. Am. Pet. 6, ECF No. 19. The United States Supreme Court has not yet resolved whether a habeas petitioner may be entitled to habeas relief based on a freestanding actual-innocence claim. *See McQuiggin*, 569 U.S. at 392. However, Fifth Circuit precedent precludes consideration of such a claim. *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009). Consequently, this claim is not subject to the Court's review.

## B. Insufficient Evidence

Under his second ground, Petitioner claims that the evidence was insufficient to persuade a properly instructed, reasonable jury of his guilt beyond a reasonable doubt. Am. Pet. 6, ECF No. 19. Federal courts have extremely limited habeas review of claims based on the legal sufficiency of the

6

evidence, and the standard for reviewing such claims is supplied by *Jackson v. Virginia,* 443 U.S. 307 (1979). Applying that standard and relevant state law, the state appellate court addressed the claim as follows:

**A. Standard of Review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. The trier of fact is the sole judge of the weight and credibility of the evidence. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. Instead, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.

**B. Applicable Law**

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

In a homicide case, the State is not required to produce a body. The State must show the death of the victim was caused by the criminal act of the defendant.

The jury charge included, and the indictment alleged, several manners and means by which [Petitioner], acting alone or as a party, intentionally or knowingly caused Sartain's death: by a manner and means unknown to the grand jury, or "by kicking [Sartain] with his feet or by punching him with his hands or by preventing [him] from obtaining insulin in sufficient quantities to prevent his death when [Petitioner] knew that . . . Sartain was an insulin-dependent diabetic, or by a combination of any or all of the aforementioned means."

**C. Evidence**

**1. The Beating**

On September 6, 2007, Sartain, a methamphetamine user and an insulin-dependent diabetic, stole his grandmother's checkbook, forged a check, and gave it to his friend Natalie Bazan to cash. Police arrested Bazan after the bank confirmed that the check was forged. Bazan's husband, Brian Johns, upset by Bazan's arrest, bailed her out, and then the two confronted Sartain in a back room at [Petitioner] and Alejandro Orona's house.

Johns and Bazan both hit Sartain, and when Sartain moved to the front of the house to leave, [Petitioner] and Orona joined in and beat Sartain with their hands and feet. Sartain covered his head and was knocked to the ground. Several people at the house yelled for [Petitioner] and Orona to stop, but they continued kicking and hitting Sartain. Bazan, Johns, and the other people in the house fled as the beating continued.

## 2. Brian Johns's Testimony

Johns testified about Bazan's arrest and his role in starting the fight with Sartain. He said that [Petitioner] and Orona joined in as the fight moved to the front of the house, and that [Petitioner] said, "Go to sleep, bitch," as he repeatedly hit Sartain in the head. He testified that Sartain did not fight back; that Johns told [Petitioner] and Orona to stop; and that he, his wife, and others left the house when [Petitioner] and Orona would not stop beating Sartain. Johns also said that several days after the fight, [Petitioner] called him and asked him to go to the store for him or to take [Petitioner] to the store and that when he arrived at the house, the house smelled like "something was rotting real bad." He saw [Petitioner] and Orona emerge from a back room containing a table on which saws and knives rested, and he saw [Petitioner] hold up Sartain's severed head. Johns ran out of the house to tell friends what he had seen.

## 3. Melissa Morante's Testimony

Melissa Morante testified that she saw [Petitioner], Orona, and Johns beating Sartain. She stated that [Petitioner] was doing most of the beating–kicking and punching Sartain–and that she and others left the house when [Petitioner] and Orona refused to comply with their pleas to stop beating Sartain. She testified that when she returned to the house the day after the fight, she heard moans coming from the garage. When she asked about the moaning, [Petitioner] told her to, "Just shut up, you're tripping," and "Shut up, don't say anything."

Morante also testified that between the time of her initial interview with Arlington Police Detective Jim Ford about the murder and her testimony before the grand jury, she had been arrested on unrelated drug charges. She stated that she did not tell Detective Ford or the prosecutor assigned to [Petitioner]'s case about her

arrest because she had reached a confidential deal to work as an informant for the Fort Worth Police Department (FWPD) in exchange for the drug charges being dropped. Morante confirmed that the State had made no promises to her at the time of her initial interview with Detective Ford, her testimony before the grand jury, or her testimony at Orona's trial. (Orona, also arrested for Sartain's murder, was tried separately before [Petitioner].) She admitted that just prior to Orona's trial, she had failed to meet the terms of her deal with the FWPD, and she was re-arrested on the drug charges. She also confirmed that in exchange for her truthful testimony at [Petitioner]'s trial, the State had offered her a reduced sentence on those charges.

### 4. Rebecca Brauer's Testimony

Rebecca Brauer, who was not present at the beating, testified that she went to [Petitioner] and Orona's house a few days after the fight and that she heard [Petitioner] tell Orona to feed and water the "dog" as he pointed toward the garage. She said that after her visit, [Petitioner] and Orona–who normally had frequent visitor–"kind of closed the house down for a week or so." Brauer stated that when she returned to the house a week later, [Petitioner] and Orona were mopping the floor with Fabuloso cleaner, and that the house "smelled like a dead animal." She testified that after [Petitioner] and Orona had moved out of the house, [Petitioner], while intoxicated, appeared scared as he expressed concern that crime scene technicians had examined the house. [Petitioner] stated that he had used bleach to clean up blood, and told her about blood in trash bags.

On cross-examination Brauer stated that [Petitioner] told Orona to feed and water the dog in Spanish–a language she understands "a little bit," but that she does not speak. Brauer, who testified in jail clothes because she was arrested the day of [Petitioner]'s trial for failure to post bond on an unrelated misdemeanor-marijuana charge, stated that she was not testifying voluntarily and acknowledged that she had past drug convictions.

### 5. Sanjuana Garcia's Testimony

About a week after the beating, Sanjuana Garcia–who had fled from the house with Morante–returned to the house and noticed a strong dead animal smell. Garcia testified that between the time of her initial interview with Detective Ford and her testimony before the grand jury, she and Morante had been arrested on unrelated drug charges. Like Morante, Garcia did not tell Detective Ford or the prosecutor assigned to [Petitioner]'s case about her arrest because she had also reached a confidential deal to work as an informant for the FWPD in exchange for the drug charges being dropped. She admitted that just prior to testifying at Orona's trial, she had failed to meet the terms of her deal with the FWPD, that she was re-arrested on the drug charges, and that in exchange for her truthful testimony at [Petitioner]'s trial, the

State offered her a reduced sentence on the drug charges. On cross-examination Garcia admitted to smoking methamphetamines the day of the beating and confirmed that [Petitioner] was a "clean freak."

### 6. Dennis Osborne's Testimony

Dennis Osborne, [Petitioner]'s best friend, who was not present at the fight, visited the house several days after the fight. He testified that [Petitioner] told him that he and Orona had beaten Sartain because he owed them money. Osborne said that [Petitioner] had asked him to check on Sartain in the garage and to feed Sartain a burger and get him something to drink but that Osborne refused because he "didn't want to be a part to [sic] any of this. I didn't want to believe any of it was true."

Osborne stated that on his next visit to the house, there were dryer sheets on all of the air conditioning vents, that [Petitioner] had Vicks Vapor Rub on his nose, and that [Petitioner] told Osborne that Sartain had died after [Petitioner] and Orona had beaten him a second time, after Sartain had "got[ten] better and started screaming and yelling." Osborne confirmed that [Petitioner] knew that Sartain was diabetic while the beatings were occurring.

Osborne testified that later, during a barbecue cook-out at the house, [Petitioner] told Osborn that "he had just gotten rid of the problem . . . that [Petitioner and Orona] only had an arm and a leg left . . . ." Osborne confirmed that Clayton Miller and Shannon Marlowe were at the barbecue and that he later helped Miller and Marlowe load a beat-up black Grand Prix that was missing its hood onto a tow-dolly hooked up to a Chevrolet pick-up truck. The pick-up truck had a bathtub full of trash bags in its bed. Osborne testified that the bathtub had previously been in [Petitioner]'s garage and that there was a maroon stain in the garage where the bathtub had been located. He said that Miller later told him that the Grand Prix was in Waco. Osborne also testified that sometime after the car was disposed of, [Petitioner] described and demonstrated to Osborne how he had cut up Sartain's body.

Osborne, in jail clothes, confirmed that he was in federal custody at the time he gave his initial statement to Detective Ford, that Detective Ford wrote his statement for him because he was dyslexic, that after Detective Ford read his statement to him, that Osborne dictated corrections to his statement, and that Osborne initialed those corrections. Osborne said that he declined Detective Ford's offer to speak to federal authorities or the parole board on Osborne's behalf; that his release from federal custody was not related to his statement; and that three days prior to [Petitioner]'s trial, the State arrested him for evading arrest. He stated that he was not testifying voluntarily and that in exchange for his testimony at [Petitioner]'s trial, the State agreed to drop the evading-arrest charges.

On cross-examination, Osborne admitted that he had a history of selling drugs and that he told [Petitioner]'s investigator (1) that he did not see any body parts, (2) that he felt pressured into his statement and his previous testimony, (3) that Detective Ford had threatened his freedom and told him what to say, (4) that he was worried because his urine had tested positive for drugs, (5) that his statement was "bullshit," and (6) that in "his heart" he knew that [Petitioner] was innocent. Osborne also stated that he had lied to [Petitioner]'s investigator because he was scared of [Petitioner], the State, and the defense, and that was why his statement to the police and testimony differed from what he told [Petitioner]'s investigator. He further testified that Detective Ford told him that he had it out for [Petitioner]; that because he was already "doing time," he was not concerned about the results of his urine test; that [Petitioner]'s electricity was off around the time of the beating; that because [Petitioner] lacked power, a big pot of chicken and dumplings spoiled on the stove; that [Petitioner] and Orona kept the house pretty clean; and that they threw all of their trash, including the spoiled chicken and dumplings, into the garage.

### 7. Joe Olivarez's Testimony

Joe Olivarez, who was not present at the beating, testified that he was a methamphetamine user and occasionally bought drugs from [Petitioner] and Orona, that he met Sartain several months before the beating at a house where they both purchased drugs, that Sartain lived with him for a while, and that he has not heard from Sartain since the day of the beating. He also stated that Sartain drove a black "Grand Prix or Monte Carlo."

Olivarez, in jail clothes, confirmed that he had been arrested for attempted forgery and that because he was a repeat offender, he was facing a twenty-five-year-to-life sentence on that charge. He also testified about his criminal history–that he had served a fifteen-year sentence for murder, that he had served six years for amassing three DWI charges in an eight-month period, and that he had also served nine months for possession of a controlled substance. He stated that a recent charge against him for being a felon in possession of a weapon had been dismissed because of insufficient evidence. He confirmed that once he finished testifying in [Petitioner]'s case (in exchange for his guilty plea), the State would waive the repetition counts on his forgery charge, which would reduce the punishment range to that of a state-jail felony charge (six months to two years). He also confirmed that because he would get credit for time served, he would be released at the end of his duties as witness in [Petitioner]'s trial.

### 8. Chris Barakat's Testimony

Chris Barakat, a self-employed auto-shop and U-Haul dealership owner in Arlington, testified that he rented a tow-dolly to Marlowe on October 22, 2007, and

confirmed that the receipt stated that a Chevrolet half-ton pick-up truck would be used to tow a 2000 Pontiac Grand Prix. He said that he thought that the tow-dolly had not been returned "but [did not] know that information."

### 9. Joshua Schlasman's Testimony

Fifteen-year-old Joshua Schlasman testified that sometime in 2007, Clayton Miller and a woman driving a Chevrolet Z71 pick-up truck towed a beat-up black Pontiac Grand Prix to Waco and left it with Dayarl Matheny, who Schlasman's family was living with at the time. Schlasman said that although the Pontiac car contained loose trash and was missing its hood, a bumper, the windshield, and some windows, it was still drivable. He also said that there was a bathtub filled with trash and tires in the bed of the pick-up. He testified that later that evening, he and his mother looked inside the trunk of the car, that he saw a clear bag with either "blood or transmission fluid on it," and that his mother quickly slammed the trunk shut. He said that they sold the bathtub and burned the trash bags and loose trash, and that Matheny cut apart the Grand Prix, burned out the interior, and sold the car as scrap metal. Although he told police in his initial statement that he did not see any blood or body parts, Schlasman testified that he thought he saw an arm in the trunk but that he could not be sure.

On cross-examination, Schlasman confirmed that he had not mentioned seeing any body parts in his prior testimony at Orona's trial. Later, after a bench conference, Schlasman was recalled for further cross-examination, and he stated that he had exaggerated in his testimony and admitted that he had not seen any body parts in the car.

### 10. Arlington Police Detective Jim Ford's Testimony

A few months after the beating, Detective Ford received a tip about a murder from an Arlington jail inmate. Detective Ford eventually tracked down witnesses and, approximately seven months after the beating, although [Petitioner] and Orona no longer lived there, the police searched the house and yard for evidence of a murder. Detective Ford testified that a chemical sprayed onto the walls and floors showed some areas that could have blood on them but that police were unable to perform further testing before the chemicals destroyed the potential DNA samples. He also confirmed that the blood samples that the police took from baseboards in the living room did not test positive for Sartain's DNA. Detective Ford stated that he located a badly damaged tow dolly in Waco that had been rented by Marlowe, that Sartain had been arrested shortly before his disappearance, and that he had obtained information about the vehicle Sartain drove from impound records related to that arrest and from witnesses. He confirmed that Sartain had been listed as "missing endangered" in a database that is accessible to all law enforcement agencies and that

he had not received any contacts related to Sartain's presence on the list.

On cross-examination, Detective Ford acknowledged that he was not testifying that the vehicle Sartain drove was registered to Sartain, and he confirmed that [Petitioner] had shown proof of insurance and paid the fee to retrieve the car from the impound. He also confirmed that in an unrelated November 2007 investigation of [Petitioner]'s house, the police analyzed eighteen swab-based samples of material from baseboards, walls, and a ceiling that they acquired for testing and found no evidence of Sartain's DNA. Detective Ford also stated that the room searched in November 2007 was not the room where the fight with Sartain had started. He agreed that the house contained no physical evidence that related to Sartain.

### 11. Jo Ann Mitchell's Testimony

Mitchell, Sartain's mother, testified that, after the forgery incident, she told Sartain that she never wanted to see him again. But she also explained that he was very close to his grandmother and visited her often and that neither she nor her mother had heard from Sartain after the day of the beating. She confirmed that Sartain had a car but said that she did not know what kind. She testified that Sartain was a "brittle diabetic" and that he had a history of complications and hospitalizations due to his heightened sensitivity to insulin.

### 12. Deputy Tarrant County Medical Examiner Lloyd White's Testimony

Dr. White testified that he had reviewed Sartain's medical records from 2005 to 2007, that too much or too little insulin causes brittle diabetics to become ill very quickly. He also said that, based on Sartain's medical records, a person with a similar medical condition who was subjected to a serious injury–such as the beating Sartain experienced–would be more vulnerable to death than a person without the same medical condition. Specifically, Dr White stated that "any kind of injury . . . exacerbates the effects of diabetes" and that the most serious effect would be ketoacidosis which could result in sudden death.

### 13. Defense Witnesses Testimonies

Charlotte Youngquist, [Petitioner]'s mother, and Amy Garcia, [Petitioner]'s sister, testified that while they were both visiting [Petitioner] in jail before trial, they heard Johns, who was working in the jail's visiting area, speak to [Petitioner] on the jail's phone-intercom system. They both said that although they could only vaguely hear [Petitioner]'s side of the conversation, they heard [Petitioner] ask Johns why he lied, and that Johns responded that the police made him do it.

Melissa Gutierrez, the mother of [Petitioner]'s children, testified that she and [Petitioner] broke up in 2003, that they shared parenting of their two children, that their parenting activities occasionally evolved into romantic encounters, and that she and her children were at [Petitioner]'s house the weekend of the beating. She said that she arrived at [Petitioner]'s house at 7:30 p.m. on Friday, September 7, 2007, that a tattoo artist present at [Petitioner]'s house gave her a tattoo, and that she remembered the date because she acquired the tattoo the weekend before her mother's birthday on September 13. She also said that [Petitioner], Orona, and the tattoo artist were the only people at [Petitioner]'s house on Friday; that she spent Friday night at the house; that the next morning, she retrieved her children from another residence and returned with them to [Petitioner]'s house where they all spent Saturday night; and that she and her children left the house on Sunday. Gutierrez said she returned to [Petitioner]'s house on Thursday, September, 13, 2007, and spent the night. She testified that during this time, she had not observed anything out of the ordinary, had not smelled anything unusual, and was not restricted from entering any part of the house.

On cross-examination, Gutierrez admitted that although she had visited [Petitioner] at least thirty times in jail, she did not alert [Petitioner]'s attorney to the facts in her testimony until the week of the trial.

### D. Analysis

[Petitioner] argues that the evidence is insufficient to prove that Sartain is deceased or that Sartain was murdered. Specifically, he argues that although the evidence shows that Sartain is missing, the evidence is insufficient to show that Sartain owned the Grand Prix, that there is no evidence linking [Petitioner] to Sartain's death, and that each of the state's key witnesses suffered from "significant credibility issues."

### 1. Witness Credibility

As noted above, the trier of fact is the sole judge of the weight and credibility of the evidence. The jury may choose to believe or disbelieve all or any part of any witnesses' testimony. Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury.

Morante, Garcia, and Osborne all appeared before the jury in jail clothes. They all testified about the reasons behind their arrests, any deals made with the State related to their testimonies, and whether they were testifying willingly or not. In addition, although Johns admitted that he started and participated in the fight with Sartain, his testimony that he left when [Petitioner] and Orona refused to stop beating Sartain was corroborated by Morante's and Garcia's testimonies. Osborne testified

that [Petitioner] admitted that Sartain had died after a second beating and that [Petitioner] said that he had dismembered Sartain's body. Moreover, the jury heard Osborne and Olivarez testify that Sartain drove a black Grand Prix, and the jury heard Schlasman's testimony that Miller and a woman had disposed of such a vehicle.

The jury was fully aware of the deals between the witnesses and the State regarding the witnesses' pending offenses and the circumstances surrounding their decisions to testify, and [Petitioner] questioned the witnesses about these issues. And, even though the jury heard Schlasman admit that he exaggerated about seeing body parts, the jury was free to believe his testimony that Miller delivered a black Grand Prix to the chop-shop in Waco. Likewise, the jury was free to disbelieve any or all of Gutierrez's testimony about her presence at the house at the time of the events in question. And, the jury was free to determine that the Grand Prix was Sartain's car.

## 2. Sufficiency

[Petitioner] also argues that his conviction is not supported by an extrajudicial confession or a body and, thus, the evidence is legally insufficient to establish the corpus delicti of murder. But the record reflects that [Petitioner] told Osborne–a party not present at either beating–that [Petitioner] and Orona beat Sartain a second time and that Sartain died as a result. Thus, [Petitioner] admitted that Sartain died as a result of [Petitioner]'s intentional actions, and we are left to determine whether the independent evidence corroborating [Petitioner]'s extrajudicial confession renders the commission of Sartain's murder more probable than it would be without the evidence.

[Petitioner] argues that "a review of all th[e] testimony fails, even in the light most favorable to the verdict that the jurors could infer that [Petitioner] murdered Mr. Sartain, dismembered the body, put it in a car and had it burned . . . because no physical evidence corroborated this alleged carnage." [Petitioner] misstates the State's burden. The State was not required to show how [Petitioner] disposed of Sartain's body or personal property, but testimony about [Petitioner]'s actions relative to those events could serve as evidence to prove that [Petitioner] murdered Sartain; the State was required to show beyond a reasonable doubt that [Petitioner] murdered Sartain as alleged in the indictment.

Here, the evidence reflects that Sartain disappeared after a beating witnessed by multiple parties; that [Petitioner] knew that Sartain was diabetic and needed insulin; that [Petitioner] told Orona and Osborne to give Sartain, who was in the garage, some food and water; and that a short time later multiple witnesses reported a foul odor at [Petitioner] and Orona's home–where Sartain was last seen. Additionally, a week after the beating, [Petitioner] stopped receiving guests, he

attempted to mask the odor with dryer sheets and Vick's Vapor Rub, and he cleaned the house. Further, Johns saw Sartain's severed head and a tabletop full of knives and saws, Osborne saw a reddish stain on the floor of [Petitioner]'s garage, and [Petitioner] described and demonstrated to Osborne how [Petitioner] had dismembered Sartain's body. Finally, months after moving out of the house, [Petitioner] told Brauer that he had cleaned up blood in the house and expressed concern that police were conducting forensic testing in the home, and acquaintances of [Petitioner]'s delivered a car similar to Sartain's to a chop-shop in an outlying county. We conclude that the independent evidence corroborates [Petitioner]'s extrajudicial confession. Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Sartain is deceased and that [Petitioner] intentionally and knowingly caused Sartain's death by one, or a combination, of the manners and means alleged in the indictment. Accordingly, we hold that the evidence is legally sufficient to support [Petitioner]'s conviction . . . .

Mem. Op. 2-21, ECF No. 24-4 (citations and footnotes omitted).

The state court applied the proper standard of *Jackson v. Virginia*, and, in view of the evidence presented at trial, its application of that standard was not unreasonable. Petitioner argues that the evidence is insufficient to maintain his convictions because the victim's body was never found, the only evidence at trial was circumstantial and confusing, and the victim was seen by four witnesses after the date of his alleged disappearance. Am. Pet. 8, ECF No. 19; Pet'r's Reply 4-5, ECF No. 28. However, murder may be found on the basis of circumstantial evidence in the absence of a body. *See United States v. Hebert,* 813 F.3d 551, 561 (5th Cir. 2015), *cert. denied,* 137 S. Ct. 37 (2016). The state court identified substantial circumstantial evidence that Petitioner and Orona intentionally beat the victim and/or deprived him of insulin, resulting in his death, dismembered and disposed of the victim's body and his car, and cleaned the scene of the crime. It was the jury's role to resolve any conflicts, contradictions, and inconsistencies in the evidence. *See United States v. Barksdale-Contreras,* 972 F.2d 111, 114 (5th Cir. 1992). And, the state habeas court addressed the testimony of the new witnesses and did not find it persuasive or credible.

## C. Ineffective Assistance of Counsel

Under Petitioner's third and fourth grounds, he claims that he received ineffective assistance of trial counsel. Am. Pet. 7-8, ECF No. 19. A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. To establish ineffective assistance of counsel under this standard, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) ); *Bell v. Cone,* 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting

*Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Petitioner was represented at trial by lead counsel Katheryn Haywood who was assisted by G. Russell Rowe, both experienced criminal defense attorneys. In his state habeas application, Petitioner alleged that counsel was ineffective as follows:

- Counsels failed to fully investigate his case;
- Counsels failed to interview potential witnesses Clayton Miller, Shannon Marlowe and Kevin Little;
- Counsels failed to question prospective jurors about possible bias due to improper hearsay information;
- Counsels failed to request an accomplice witness instruction regarding the testimony of Brian Johns and Natalie Bazan; and
- Counsels failed to request a lesser-included offense instruction for the offenses of deadly conduct and criminally negligent homicide.

SHR02 280, ECF No. 24-33. Petitioner essentially raises the same claims in this federal petition. Am. Pet. 7-8, ECF No. 19.

The state habeas judge conducted a hearing by affidavit on Petitioner's ineffective-assistance claims, and counsel Haywood responded as follows to the allegations (any spelling, grammatical, and/or punctuation errors and omissions are in the original):

I represented [Petitioner] in his murder trial. His trial was the month following that of his codefendant, Alejandro Orona, who was also convicted.

I hired Halo Investigations Services to investigate and assist me in the interviewing of witnesses. ALL witnesses were interviewed and all interviews recorded. In fact when the funds ran which the court approved for this investigation, the family of [Petitioner] continued to pay for further investigation of the offense with this company. I had over 10 discs of interviews, hundreds of pages of notes from the investigator and 150 emails from the investigator. We met over 10 times and he was present during the entire trial. The investigation covered everything presented, discussed, speculated and postured. This was a very, very thorough investigation.

The trial was thorough and quite frankly very good. EVERY defense was presented.

Many defensive theories were presented. Voir dire was thorough. During recess it was discovered several panel members "googled" the murder and discussed it out loud with other panel members in the hallway. I objected to the entire panel and the court questioned each prospective panel member who admitted to discussing or researching the case. Objections were carried with the trial. Those jurors were struck by the Defense. All panel members were questioned about prejudices, biases and inability to be fair and impartial. Preemptory challenges were used on those panel members who admitted to researching the case. Counsel attempted to challenge each for cause but these challenges were rejected by the court because the panel members each said they could be fair and impartial.

Requesting lesser included offenses was not part of my strategy. There was NO DNA, no body and no direct eye witness to the murder. I had hoped that by having a single count of murder the jury might decided there was not sufficient evidence to reach a guilty verdict beyond a reasonable doubt. This was strategy.

In addition, no jury was going to find Mr. Munn guilty of the lesser crime of deadly conduct. It is ridiculous to think that.

As far as accomplice witness instruction: the accomplices participated in the initial Class A assault only if [Petitioner]'s narrative is to be believed. They did not participate in murder, disposing of the body, cleaning – removing evidence or organized crime. Natalie Bazan and Brian Johns testimony corroborated each other and were supported by a third witness.

All witnesses were interviewed. Thorough cross examination was made of all witnesses and those with criminal cases pending were impeached when possible.

Objections were timely made to any and all extraneous offenses.

[Petitioner]'s family sent me many thank you cards and emails after the trial. [Petitioner] thanked me profusely and even became enraged during closing argument when the state's prosecutor attacked me and my defenses.

This trial was thorough, by the book, extensive and above all fair.

Since I have not been given instructions as to what to address, I hope this will suffice.

Russell Rowe served as co-counsel. All trial decisions and strategies were mine. Today when told about this affidavit, he stated, "What bullshit. That bastard got the best trial in Tarrant County." That about sums it up.

SHR02 247-48, ECF No. 24-33 (emphasis in original).

Counsel Rowe also responded to the allegations by affidavit as follows:

I was appointed by the court after [Petitioner]'s attorney Katheryn Haywood requested the court to appoint me to assist her due to the extensive information, witnesses, and evidence involved, and because of the severity of the charges in the case.

Although I was responsible for preparing and presenting cross-examination on several of the state's witnesses, I did so at the direction of the first chair Katheryn Haywood. All final decisions regarding witnesses, evidence, and trial strategies were made by Katheryn Haywood.

In relation to this affiant and the purpose for which this affidavit is submitted, the relevant portions of [Petitioner]'s Writ of Habeas Corpus, specifically sections V, 5 (A-D) and their assertions claiming ineffective assistance of counsel will be addressed.

5 (A) Trial counsel did not fail to conduct a thorough investigation, and in fact was appointed a licensed private investigator, Eddie Frankum, to assist with the defense in the case. Eddie Frankum's efforts were as thorough as necessary to provide counsel with necessary defense witnesses. The only testimony regarding seeing body parts inside the automobile that was towed to Waco was provided by a 15 year old boy, who later admitted under cross-examination by defense counsel Katheryn Haywood that he had never before made any statements about seeing body parts to police or even family members, and that he lied on the witness stand about seeing the body parts.

5 (B) First-chair counsel Kathryn Haywood made all reasonable objections to any jury contamination, including a motion for mistrial which was denied by the trial court. Additionally after both prosecution and defense had examined the panel, [Petitioner] participated directly with defense counsel in the selection process and stated that he was satisfied with both the jurors struck and selected by defense counsel. Although it is this affiant's opinion that the entire panel should have been excused because of the degree of contamination, this was not the opinion of the either the trial court or the appellate court.

5 (C) First-chair counsel Kathryn Haywood made all final decisions regarding any accomplice-witness instructions. Additionally, this affiant's recollection of the testimony by Brian Johns and Natalie Bazan does not support [Petitioner]'s claim of their being accomplice witnesses, as the testimony by Natalie Bazan was that she only slapped the decedent once across the face for causing her to be arrested.

5 (D) First-chair counsel Kathryn Haywood made all final decisions regarding

20

any jury instructions for lesser included offenses.

SUPPLEMENTARY INFORMATION

It should be noted that the private investigator appointed to assist the defense in this case, Eddie Frankum, has been involved in litigation against this affiant, and has threatened litigation against co-counsel Katheryn Haywood, on matters unrelated to the Munn case, since 2010. Specifically, Eddie Frankum sued this affiant for the amount of court-appointed investigator fees for which he did not get paid by the courts that appointed him, claiming affiant was responsible for the difference, in the sum total of just over $1,000.00. Despite the existence of several non-litigious procedural remedies, Eddie Frankum pursued this affiant without first seeking alternative remedy, ultimately resulting in his losing at trial.

*Id.* at 250-52.

Based on counsel's affidavits and the documentary record, the state habeas court adopted factual findings refuting Petitioner's claims. Although numerous, those findings are listed below to assist the reader (all grammatical and/or punctuation errors are in the original):

6.     The Tarrant County Criminal District Attorney's Office maintains an open file policy through the Tarrant County Electronic Case Filing System (ECFS).

7.     Ms. Haywood and Mr. Rowe had access to the State's files through the Tarrant County ECFS.

8.     Ms. Haywood hired Halo Investigation Services to assist in preparing [Petitioner]'s defense and interviewing potential witnesses.

9.     Numerous witnesses were interviewed in their investigation.

10.    Ms. Haywood and Mr. Rowe met with [Petitioner] and with Mr. Frankum on numerous occasions to discuss the defense investigation and prepare their trial defense.

11.    Ms. Haywood and Mr. Rowe fully and adequately investigated [Petitioner]'s case.

12.    Ms. Haywood and Mr. Rowe fully and adequately communicated with [Petitioner] regarding the State's case against him.

13.    Ms. Haywood and Mr. Rowe pursued a defense theory of "actual innocence" because there was no body, no DNA and no direct eyewitnesses.

14.    The defense theory developed by Ms. Haywood and Mr. Rowe was a matter of reasonable professional judgment

15.    Ms. Haywood and Mr. Rowe thoroughly prepared their defense for trial.

16.    Ms. Haywood and Mr. Rowe engaged in a thorough voir dire examination.

17.    Upon learning that several venire members had googled the murder and discussed it out loud, Ms. Haywood objected to the entire venire panel and had the trial court individually question each venire member.

18.    Ms. Haywood sought challenges for cause and exercised peremptory challenges against those venire members who had researched [Petitioner]'s case.

19.    [Petitioner] was satisfied with the juror selection process.

20.    Ms. Haywood and Mr. Rowe reasonably handled the voir dire process.

21.    Ms. Haywood and Mr. Rowe thoroughly cross-examined the State's witnesses, and attempted to impeach their testimony.

22.    Through cross-examination, Ms. Haywood got one witness to recant part of his testimony and police statements.

23.    Ms. Haywood did not request an accomplice witness instruction regarding Natalie Bazan and Brian Jones because their testimony corroborated each other and was supported by a third witness.

24.    Ms. Haywood's decision not to request an accomplice witness instruction was a matter of reasonable professional judgment.

25.    Ms. Haywood did not request an instruction on the lesser offense of deadly conduct because it conflicted with the defense strategy of actual innocence.

2 6.    Ms. Haywood did not believe that a jury would find [Petitioner] guilty only of deadly conduct.

27.    Ms. Haywood's decision not to request an instruction on the lesser offense of deadly conduct was a matter of reasonable professional judgment.

28.     Ms. Haywood and Mr. Rowe fully and adequately litigated [Petitioner]'s trial defense.

29.     Ms. Haywood and Mr. Rowe provided [Petitioner] with adequate representation guaranteed by the Sixth Amendment.

30.     The . . . evidence undercuts any likelihood that the outcome of this case would have been different with another counsel or if Ms. Haywood and Mr. Rowe had represented [Petitioner] in another manner:

        . . .

31.     Given [the] evidence, there is no reasonable probability that the jury would have reached a different result or verdict with counsel other than Ms. Haywood and Mr. Rowe.

32.     [Petitioner] was not denied effective assistance of trial counsel.

*Id.* at 281-89 (record citations omitted).

Based on its factual findings, and applying the *Strickland* standard, the state court entered the following relevant legal conclusions (all grammatical and/or punctuation errors are in the original):

8.      Ms. Haywood and Mr. Rowe adequately and independently investigated [Petitioner]'s case.

9.      Ms. Haywood and Mr. Rowe fully and adequately communicated with [Petitioner] regarding the State's case against him.

10.     Ms. Haywood and Mr. Rowe developed a reasonable defense strategy of actual innocence.

11.     Ms. Haywood and Mr. Rowe fully and adequately prepared for [Petitioner] trial.

12.     Ms. Haywood and Mr. Rowe thoroughly handled the jury selection process.

13.     Ms. Haywood and Mr. Rowe exercised reasonable professional judgment in deciding which witnesses to present and what evidence to contest.

14.     Ms. Haywood exercised reasonable professional judgment in deciding not to request an accomplice witness instruction or an instruction on the lesser

offense of deadly conduct.

15. Ms. Haywood and Mr. Rowe functioned as counsel guaranteed by the Sixth Amendment.

16. [Petitioner] has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the result of his trial would have been different.

17. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct sufficient to undermine confidence in the outcome is not established.

18. [Petitioner] received effective assistance of trial counsel.

*Id.* at 291-92 (citations omitted).

Relying on the presumptive correctness of the state courts' factual findings, and having independently reviewed Petitioner's claims in conjunction with the state court records, the state court's application of *Strickland* was not unreasonable. Petitioner fails to show that counsel's representation fell below objective standards of reasonableness or that the defense was prejudiced as a result of counsel's representation. His claims are largely conclusory, with no legal and/or credible evidentiary basis, refuted by the record, involve matters of state law, or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Green v. Johnson,* 160 F.3d 1029, 1037, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"); *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995) (stating an "attorney's actions during voir dire are considered to be a matter of trial strategy");

*Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (providing "the presentation of witness testimony is essentially strategy and thus within trial counsel's domain").

A petitioner shoulders a heavy burden to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner presents no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state court unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d).

### D. Evidentiary Hearing

Finally, Petitioner asserts that he was unable to "fully develop" one or more of his claims in state court and he requests an evidentiary hearing. Pet'r's Am. Br. 19, ECF No. 20; Pet'r's Reply 6, ECF No. 28. However, his claims were adjudicated on the merits in state court, save for his fifth claim, and he has failed to overcome the limitation of § 2254(d)(1) on the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-86 (2011). Thus, no evidentiary hearing is warranted.

## VI. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, for the reasons discussed, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 21st day of August, 2018.

Reed O'Connor
UNITED STATES DISTRICT JUDGE